IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MAGDALENE LUCERO,

    **Plaintiff,**

vs.                Civ. No. 09-908  JH/WDS

SANDIA CORPORATION, d/b/a SANDIA
NATIONAL LABORATORIES,

    **Defendant.**

## MEMORANDUM OPINION AND ORDER

This case is before the Court on *Defendant's Motion for Summary Judgment* [Doc. No. 73]. After Defendant filed its motion, this Court granted in part Defendant's motion to dismiss Plaintiff's claim for intentional infliction of emotional distress as well as a stand-alone claim for violation of the Lilly Ledbetter Pay Act.  Then, in her response to the motion for summary judgment [Doc. No. 82 at 1, n.1], Plaintiff expressly withdrew her claim that Defendant retaliated against her in retaliation for her exercise of her First Amendment rights.  Furthermore, Plaintiff appears to have abandoned her claim that Defendant's decision to deny her a position as a technical team leader was a result of unlawful discrimination.  Thus, the issues that remain before the Court are whether the raises in Plaintiff's pay, as well as the restructuring of her job in 2008, were the result of discrimination based on Plaintiff's age and national origin.  After reviewing the arguments of counsel, the evidence in the record, and the applicable law, the Court concludes that the Defendant's motion for summary judgment should be granted in its entirety.

## FACTS

The facts of this case are largely undisputed.  However, when a dispute does arise, the Court

resolves it in the light most favorable to Lucero. For the purposes of this motion for summary judgment, the facts are as follows.

Plaintiff Magdalene Lucero ("Lucero") was born in June of 1950. After graduating from high school in the late 1960's, Lucero went to work at Defendant Sandia Corporation ("Sandia") as a secretarial trainee. She rose through the ranks, eventually achieving the status of Member of the Technical Staff ("MTS"). At all relevant times, Lucero worked in the Safeguards and Security center ("S & S"), which was reorganized in June of 2008. From September of 2003 through June of 2008, Lucero's direct manager was Joe Sandoval.

Sandia distributes pay raises in the fall of each year. In order to determine an employee's raise, Sandia follows a complex procedure that evaluates several factors, including an employee's "value of contribution" ("VOC") rating. There are various VOC ratings. From highest to lowest, the current VOC ratings are "outstanding contributor," "full contributor–high," "full contributor–meets expectations," "full contributor–low," and "not fully contributing."[1] Although managers determine an employee's VOC rating, they are restricted in the manner in which they may do so. For example, a manager may award no more than one in four employees a rating of "outstanding contributor," and that ratio must be rounded down. In other words, whether a manager oversees four or seven employees, he may award only one "outstanding contributor" rating in a given year. The other VOC ratings are similarly determined by ratio. Accordingly, employees must compete against each other for the limited number of high ratings. Furthermore, an employee's raise depends not only on her VOC rating, but also on her current salary relative to her peers, and the size of the negotiated raise package that Sandia has obtained for that year for distribution to its

---

[1] Prior to 2006, the categories were "outstanding contribution," "full contribution," and "not fully contributing."

employees. In other words, an employee's raise in any given year is affected by all three factors. For example, an employee who receives an "outstanding contributor" rating may receive a relatively modest raise if she is already well compensated relative to her peers and if the overall Sandia raise package is small that year.

Joe Sandoval assigned Lucero her VOC rating for the years 2004, 2005, 2006 and 2007. He rated her as an "outstanding contributor" for 2004, as a "full contributor" in 2005, a "full contributor–meets expectations" in 2006, and as a "full contributor–high" in 2007. In 2008, Lucero received an "outstanding contributor" rating from a different manager. At no point did Sandoval or any other individual manager decide the amount of Lucero's raise. Rather, in accordance with Sandia procedures, that decision is made by a compensation group using a computer program that takes into consideration an employee's VOC rating, her current compensation relative to her peers, and the size of the negotiated raise package.

In June of 2008, Sandia reorganized the S & S Center where Lucero worked. Several Sandia managers, including Tony Aragon, Roger Showalter, Ty Christie, and Scott Ashbaugh, made the decision as part of the reorganization to assign Lucero to handling "vault-type rooms" ("VTRs") in the Technical Security Systems ("TSS") department.[2] Prior to June of 2008, oversight of VTRs was

---

[2] While Lucero purports to dispute that these four managers made the decision to reorganize her work, and that instead Joe Sandoval made that decision, she cites no admissible evidence on that point, therefore failing to create a genuine issue of material fact. Instead, she states in her post-deposition affidavit that she viewed minutes from a reorganization meeting indicating that Joe Sandoval stated that the only work Lucero did was VTR codes. The minutes themselves are not in evidence, and Sandia denies their very existence. In any event, this evidence is not in the record and is inadmissible. Indeed, it appears to be triple hearsay–an out of court statement by Sandoval recorded in a document not currently in evidence and then described in yet a third out of court statement by Lucero. Lucero argues that Sandoval's statements are the statements of a party opponent, although Sandoval is not a party. Even so, that would address only one layer of hearsay. Further, Sandoval's alleged statements are not evidence that Sandoval had the decision making power over Lucero's job duties.

3

split between TSS and the Physical Security department. The reorganization stemmed in part from a desire to consolidate VTR oversight into one department, which resulted from the General Accounting Office and DOE's concerns about the protection and storage of classified information. Ashbaugh testified that he saw VTRs as the "crown jewel" of physical security, that he felt Lucero's knowledge of VTRs made her a key leader of the VTR program, and that he wanted to put his "best people" on the VTR program. Thus, Lucero was designated as the VTR project lead; she was not demoted. Her pay and benefits remained the same, and she was given a new office, which was no less desirable then her previous office. However, she no longer performed physical security work. Lucero asserts that the reorganization resulted in a reduction in her duties that constituted an adverse employment action. Later, team leader Natalie Barnett and manager Scott Ashbaugh offered Lucero the opportunity to return to physical security work, but she declined and therefore remained in TSS.

On October 9, 2008, Lucero filed an EEOC complaint alleging discrimination on the basis of her age and race/national origin. Then, on September 18, 2009, she filed her original complaint in this Court asserting those same claims, plus several others. After rulings by this Court and after Lucero declined to pursue some of her claims, all that remain are her claims that her raises and the reorganization of her job were the product of discrimination based on race and age.

## LEGAL STANDARDS

Summary judgment is proper if there is no genuine dispute as to any material fact and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[3] When applying this standard, "we view the evidence and draw reasonable inferences therefrom in the light most

---

[3] By amendment effective December 1, 2010, the summary judgment standard previously enumerated in subsection (c) was moved to subsection (a), without significant change. *See* Fed. R. Civ. P. 56 advisory committee note (2010 Amendments).

favorable to the nonmoving party." *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1243 (10th Cir. 2010) (internal quotation marks omitted).

Both Lucero and Sandia agree that the Court should evaluate her discrimination claims using the three-step framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), which applies when a plaintiff does not come forward with any direct evidence of discrimination. *Jones v. Oklahoma City Pub. Schools*, 617 F.3d 1273, 1278-79 (10th Cir. 2010) (upholding the continued applicability of *McDonnell Douglas* to ADEA claims after *Gross v. FBL Fin. Servs., Inc.*, --- U.S. ----, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)). Under this framework, the plaintiff must initially establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its action. *Id.* "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If a plaintiff fails to establish a prima facie case, however, the court need not reach the second and third steps and may grant summary judgment in favor of the defendant. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008) ("In the absence of facts tending to establish this initial inference, plaintiff is not entitled to the presumption of discrimination and a defendant is not required to defend against the charge.").

## **DISCUSSION**

In order to establish a prima facie case of discrimination under the ADEA, a plaintiff must ordinarily prove that: "1) she is a member of the class protected by the [ADEA]; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less

favorably than others not in the protected class." *Jones*, 617 F.3d at 1279 (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998)).  Similarly, "[t]o make out a prima facie case of [race] discrimination, [plaintiff] must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).  Here, it appears there is no dispute that Lucero is a member of two protected classes (over age 40 and Hispanic), and that she was qualified for the position she held.  Instead, the issues are whether she suffered an adverse employment action and whether she was treated less favorably than similarly situated employees who were not in her protected class.

**I.      Prima Facie Case of Discrimination**

"The Tenth Circuit liberally defines the phrase 'adverse employment action.' Such actions are not simply limited to monetary losses in the form of wages or benefits.  Instead, we take a 'case-by-case approach,' examining the unique factors relevant to the situation at hand." *Sanchez*, 164 F.3d at 532 (citations omitted). Although the Tenth Circuit does not deem "a mere inconvenience or an alteration of job responsibilities to be an adverse employment action," *id*. (quotation omitted), the prong is satisfied by a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Here, there is no doubt but that at all relevant times, Lucero was over 40 years old and therefore a member of the protected class for purposes of the ADEA, that she was qualified to do her job, and that she is Hispanic and therefore a member of a protected class under Title VII.  The questions presented, therefore, are whether Lucero has successfully demonstrated that she suffered

an adverse employment action, and whether or not she was treated less favorably than similarly situated employees who were not in the protected class.

### A. Raises in Pay[4]

Lucero argues that Sandia discriminated against her by giving her lower pay raises, on a percentage basis, than it granted to younger and non-Hispanic MTS employees in Lucero's area.

In *Amro v. Boeing*, a case relied upon by Lucero, the Tenth Circuit held, "A person alleging a Title VII wage discrimination claim must show, as part of his prima facie burden, that he was paid less, or given a lesser raise, than other similarly situated non-protected class employees." *Amro v. Boeing Co.*, 232 F.3d 790 (10th Cir. 2000) (citing *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997). This means that in order to meet her prima facie burden, Lucero must demonstrate that there were in fact other similarly situated MTS employees outside her protected class who received higher raises. *Id*. This includes more than merely identifying such allegedly similarly situated individuals, but also providing "evidence of their performance, training, education or skills." *Id*. As the Tenth Circuit further observed, a plaintiff's "own opinion that his performance is excellent does not raise a fact question as to how his performance compares to others." *Id*. (citing *Jones v. Denver Post Corp.*, 203 F.3d 748, 754 (10th Cir. 2000) (" 'It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.' ").

---

[4] In Doc. No. 74, Sandia has filed, under seal, detailed information regarding the name, age, ethnicity, salary, VOC rating, base pay, and non-base pay of each of the other MTSs in Lucero's organization for 2003 to 2008, as well as information regarding how well each of them was compensated as compared with the private market for individuals with similar skills, and the rate at which each was compensated compared to his Sandia peers. Due to the private nature of such information, the Court will discuss the data generally but will not refer to any of those individuals by name.

Here, Lucero argues that while her manager, Joe Sandoval, gave her the highest VOC rating in 2004, he gave her lesser ratings in the years 2005-2007, resulting in her receiving lower raises than in previous years. Missing is any evidence comparing Lucero's performance, education, skills, and accomplishments in those years to those of other MTS's outside the protected class who received higher ratings and higher raises than she received. In the absence of such evidence, Lucero cannot demonstrate that she was indeed "similarly situated" to the other employees. Under *Amro*, it is not enough for Lucero to claim that her ratings and raises were not high enough; rather, it is her prima facie burden to come forward with evidence to support that claim. Lucero has not done so, and therefore failed to make her prima facie case. For this reason alone, Sandia is entitled to summary judgment on Lucero's claim that her pay raises were discriminatory. *Kosak v. Catholic Health Initiatives*, 2010 WL 4250009 at *2 (10th Cir. Oct. 28, 2010) (unpublished) ("If a plaintiff fails to establish a prima facie case, however, the court need not reach the second and third steps and may grant summary judgment in favor of the defendant.").

Similarly, Lucero has failed to meet her prima facie burden to show that her raises amounted to an adverse employment action. Rather, the evidence shows that in each year from 2003 to 2008, she received a raise that was within the range of raises given to her peers. For example, in 2003 Lucero received a 2.6% raise, leaving her the highest paid member of her MTS peer group. The highest raise that year was 8.2%, awarded to an Hispanic male about eight years younger than Lucero who not only earned an "outstanding contributor" rating, but also was paid significantly less than Lucero. The smallest raise, 1.5 %, was awarded to a white male who was about five years younger than Lucero. For 2004, Lucero received a 2.5% raise. That year, raises among her peers were all between 0% and 3.7%. The highest raise went to a white male who earned an OC rating but earned a salary significantly less than Lucero. There were several white and younger employees

who received smaller raises than Lucero. The data reveals similar patterns in the other years. This hardly supports an inference that any of Lucero's raises constituted an adverse employment action, especially absent any evidence comparing her performance, education, and skills to those outside the protected class who received higher raises. *See Gillis v. Ga. Dep't of Corrections.*, 400 F.3d 883, 887 (11th Cir. 2005) (the denial of a pay raise can constitute an adverse employment action that affects a plaintiff's compensation), and *Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1091 (11th Cir.2004) (a "comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." ). For this additional reason, Lucero has failed to meet her prima facie case.

### B.     Job Reorganization

#### *(1) Sham factual issue*

As a threshold matter, the Court must determine whether Lucero's affidavit, attached to her response to the motion for summary judgment, attempts to create a sham factual issue as to whether the reorganization of the S& S Center resulted in a adverse employment action for Lucero. It is certainly true that Lucero's affidavit provides a significant amount of information on this subject that is not covered in the portions of her deposition that the parties have provided to the Court. According to Sandia, Lucero had the opportunity provide the information at her deposition and failed to do so, and now, when faced with a motion for summary judgment, she is attempting to create a sham factual issue.

As the Tenth Circuit has explained, "an affidavit may not be disregarded [solely] because it conflicts with the affiant's prior sworn statements. In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th

Cir. 1986) (citation omitted). In determining whether an affidavit creates a sham fact issue, the Tenth Circuit directs the Court to consider whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) (quotation omitted). Indeed, the Tenth Circuit requires that a district court first "determine whether the conflicting affidavit is simply an attempt to create a 'sham fact issue' " before excluding it from summary judgment consideration. *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1010 n. 2 (10th Cir. 1992) (quoting *Franks*, 796 F.2d at 1237).

First, in reviewing both Lucero's deposition and her post-summary judgment affidavit, the Court concludes that the affidavit contains a great deal of information about Lucero's change in duties that she did not describe in her deposition, despite being questioned extensively on that issue. In this case, counsel for Sandia did cross examine Lucero during her deposition, asking her specific questions about her job duties both before and after the 2008 reorganization. *See* Doc. No. 73, Ex. A, Lucero Depo at pp. 117-128. Lucero included information in her affidavit that she did not mention in her deposition, such as many of the specific duties and programs she worked on before and after the reorganization. Further, Lucero changed other testimony, such as the number of employees she supervised before the reorganization. Next, it is clear that the evidence regarding the change in Lucero's deposition is not newly discovered; rather, Lucero (who had already been through the reorganization and had retired from her job) would have had the same information at the time of her March 19, 2010 deposition that she had when she signed her August 23, 2010 affidavit. Finally, the Court can discern no confusion in Lucero's deposition that her affidavit attempts to explain. Rather, the affidavit simply appears to be an attempt to add new and different

information that Lucero did not offer at her deposition when she was asked about her change in duties. It is not clear why Lucero changed her deposition testimony in this manner; in its reply brief, Sandia argued that Lucero's was a sham affidavit, and Lucero did not seek permission to file a surreply in order to explain the contradiction between her affidavit and deposition. In any event, based upon the foregoing analysis of the *Franks* factors, the Court concludes that for summary judgment purposes, Lucero's affidavit is intended to create a sham issue of fact and should be excluded from consideration.

Thus, the Court is left to determine whether Lucero's deposition testimony demonstrates a "reassignment with significantly different responsibilities" under *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004)

### *(2) Lucero's Deposition*

In her deposition, Lucero testified that before the 2008 reorganization, she had a "larger scope of work" than she had afterwards. Lucero Depo. at 116. Lucero testified that before the reorganization, she organized and distributed all the physical security work among herself and other employees, even though this was not technically her responsibility, *id*. at 116-17, and she was in charge of Physical Security (including limited areas, site service requests for new construction, and foreign national requests), *id*. at 119-120. She also stated that she supervised another employee who worked on "prohibited articles," id. at 120-121, as well as a second employee who was working on a plan to "bring down all the 26 enhancements that had been placed at Tech Area V." *Id*. at 121. She also worked on "corrective action plans" and "deviations." *Id*. Finally, she provided oversight for VTR's. *Id*. at 122. Immediately after the reorganization, Lucero was assigned primarily to VTRs, *id*. at 124, though she was also newly assigned to the "change control board." *Id*. at 126. Several months later, Lucero became a project leader, *id*. at 125, and then the following year she

11

also took on corrective action plans for the Technical Security department.

Although it is a close question, the Court concludes that based on the foregoing evidence, a jury could find that this reduction and narrowing of Lucero's job duties constitute an adverse employment action. Thus, as to a change in job duties only, the Court concludes that for summary judgment purposes, Lucero has met her prima facie case.

**II.    Legitimate, Non-Discriminatory Reason**

1. Raises in Pay[5]

Sandia has come forward with evidence of a legitimate, non-discriminatory reason for the variations in Lucero's raises in pay on a percentage basis. For example, it has come forward with evidence explaining that the size of a Sandia employee's raise depends not only on her VOC rating, but also on her pre-evaluation salary, such that an employee who receives a high rating but is already earning above the peer group average can usually expect a raise that is smaller than that awarded to a fellow employee who is also highly rated, yet whose pre-evaluation salary is below average. Throughout the relevant time period, Lucero not only had one of the three highest salaries among her MTS peers (the peer group ranged in size from 12 to 16 employees), but also received a base salary that was above the average for her peers. The only exception for this was performance year 2006, when her base salary fell to 99.47% of that of her Sandia peers (though it remained in the top three among her MTS peers in her organization), and 2007, when Lucero's salary was 104% of her Sandia peers, though her salary was sixth highest out of 15 organizational peers. Sandia also came

---

[5] After having found that Lucero failed to satisfy her prima facie burden to demonstrate that her pay raises were adverse employment actions, the Court need not reach other factors in the *McDonnell-Douglas* burden-shifting analysis. However, the Court does so in order to state an alternative basis for its summary judgment ruling.

forward with undisputed evidence that it caps the number of OC ratings that managers may award, and that the "pot" of money available for raises is not only limited, but also varies from year to year.

In addition, Sandia has come forward with evidence that while Lucero's work was very good, for several years after 2004 her peers' work performance exceeded hers. Her supervisor, Joe Sandoval, explained that beginning in 2005, several MTS employees with advanced degrees in subjects such as physics, math, engineering, computer science, business, and national security joined the center in an effort to complete complex technical work related to a core reactor. He testified that while Lucero continued to do very good work over the next few years, her performance was outstripped by the excellent technical work that some of her peers were doing, and as a result, she did not receive an "outstanding contributor" rating during that time frame. This fact, combined with Lucero's already relatively high level of compensation, resulted in her receiving moderate raises during those years.[6] This evidence of a legitimate, nondiscriminatory reason is undisputed.

2. Job Reorganization

Similarly, Sandia has come forward with a legitimate, non-discriminatory reason for narrowing Lucero's job duties to VTRs during the 2008 reorganization. Specifically, it has come forward with evidence that prior to June of 2008, oversight of VTRs was split between TSS and the Physical Security department, and that the reorganization stemmed in part from a desire to consolidate VTR oversight into one department. This, in turn, resulted from the General Accounting Office and DOE's concerns about the protection and storage of classified information. Lucero

---

[6] A review of the information provided in sealed Doc. No. 85 reveals that while Lucero did not receive the highest raises in years 2003 to 2007, nor were her raises particularly low. For example, in 2005 eight of Lucero's sixteen peers received raises that, on a percentage basis, were the same or lower than hers. Some of those individuals were not Hispanic, and others were younger than age 40.

presented Ashbaugh's testimony that he saw VTRs as the "crown jewel" of physical security, that he felt Lucero's knowledge of VTRs made her a key leader of the VTR program, and that he wanted to put his "best people" on the VTR program. Thus, Sandia has offered a legitimate, non-discriminatory reason for its decision to focus Lucero's duties on VTRs in the reorganization.

**III.    Pretext**

       1.  <u>Raises in Pay</u>

Having reviewed the evidence in the light most favorable to Lucero, the Court concludes that she has failed to come forward with evidence that Sandia's explanation of her raises was mere pretext for age and race discrimination. Through out her response brief, Lucero indicates that it was Sandoval who had an improper motive and who carried out both age and race discrimination against her. As evidence of alleged pretext of age discrimination by Sandoval, she points to testimony that he included her in a list of MTS employees who were eligible to retire, and that on more than one occasion he asked another employee if Lucero planned to retire. However, Sandia has offered undisputed evidence that Sandoval was required to ask these questions in order to offer any employee that might retire a salary benefit (the amount of one's raise up front, rather than spread out over a year), and there is simply no evidence that this explanation is pretextual. Lucero also points to evidence that she received a higher rating and raise after Sandoval was no longer her manager; however, as already discussed above, the rating was only one factor in determining the raise, the amount of which was decided by others, and Lucero has come forward with no evidence to dispute the proffered explanation that her peers performed work that exceeded hers and that throughout most of the disputed period, her pay was already above that of her peers, thereby leading to smaller raises. Similarly, Lucero relies on Sandoval's statements that "I was in second grade when Maggie came to work here," and "What do you want us to do, bake cookies?" in response to

14

her statement that she planned to apply for a manager's position as a demonstration of pretext. Again, the Court discerns nothing in these statements that demonstrates pretext for discrimination; rather, this appears to be typical workplace banter or sarcasm that some may find unpleasant, but is not evidence of discrimination.  The same is true of Sandoval's statements to Lucero that members of her team were unhappy working for her.  Next, Lucero complains that in 2004-2005 Sandoval took away her access to the Human Reliability Program, transferred her to an office that initially had no desk, and for that year gave her very little work to do.  And yet these occurrences (which incidentally took place outside the limitations period for this lawsuit[7]) were temporary, as Lucero acknowledges that she had a full slate of duties by the time of the 2008 reorganization of the S & S Center.  Finally, Lucero asserts that Sandoval told an Hispanic staff augmentation contractor with a degree that he could not get hired at Sandia, while in that same time frame two Anglos without degrees were so hired.  However, Lucero does not say who made the decision to hire them, only that they "were hired."

For this alternative reason, Sandia is entitled to summary judgment on Lucero's claim that her raises were discriminatory.

2. <u>Job Reorganization</u>

As evidence that Sandia's reasons for altering her job duties were mere pretext, Lucero again points to minutes from a reorganization meeting that are not in evidence.  As the Court has already discussed above, these alleged minutes are not in the record and are not admissible.  Similarly, Lucero's conversation with Scott Ashbaugh about Sandoval also contains inadmissible hearsay.

---

[7] Lucero filed her EEOC Complaint on October 9, 2008, and therefore it applies only to discriminatory actions that took place within 300 days before that date.  In addition, Lucero's claim for backpay cannot extend further back than May 28, 2007, the effective date of the Lilly Ledbetter Fair Pay Act.

Therefore, Lucero cannot rely on this evidence to establish pretext. Finally, Lucero also relies upon the same evidence of pretext that she relies on regarding her claim of discriminatory raises. The Court has already discussed this evidence and has concluded that it fails to demonstrate pretext as well. Thus, Lucero fails to meet her burden on this portion of the *McDonnell-Douglas* burden shifting analysis.

**IT IS THEREFORE ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. No. 73] is **GRANTED**.

_____
**UNITED STATES DISTRICT JUDGE**